## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

_____
                                                    )
**ABDIMSAMAD ABUBAKAR,**                             )
                                                    )
          **Plaintiff,**                             )
                                                    )
          **v.**                                     )          **Civil Action No. 1:11-cv-10456-DJC**
                                                    )
**MICHAEL J. ASTRUE,**                               )
**COMMISSIONER, SOCIAL SECURITY**                    )
**ADMINISTRATION,**                                  )
          **Defendant.**                             )
_____             )

## MEMORANDUM AND ORDER

**CASPER, J.**                                                              March 21, 2012

### I.      Introduction

Plaintiff Abdimsamad Abubakar ("Abubakar") applied for disability insurance benefits

("SSDI") and supplemental security income ("SSI") with the Social Security Administration

("SSA").  Pursuant to the procedures set forth in the Social Security Act, 42 U.S.C. §§ 405(g),

1383(c)(3), Abubakar brought this action for judicial review of the final decision of the Defendant

Michael J. Astrue, Commissioner of the SSA ("Commissioner"), issued by an Administrative Law

Judge ("ALJ") on November 24, 2010, denying Abubakar's claim.  Before the court is Abubakar's

Motion to Reverse or Remand the Decision of the ALJ and the Commissioner's Motion to Affirm

that decision.  In his motion, Abubakar claims that the ALJ erred in denying his claim for two

reasons:  first, the ALJ did not properly weigh and consider the evidence provided by Abubakar's

treating physician and failed to contact this physician to clarify her opinion; and second, the ALJ

improperly relied on opinion evidence provided by non-treating physicians.  For the reasons

discussed below, the Commissioner's motion to affirm is GRANTED, Abubakar's motion to reverse or remand is DENIED, and the Commissioner's decision is AFFIRMED.

## II.      Factual Background

Abubakar was 33 years old when the onset of his disability occurred on July 2, 2008.  R. 76.[1] He had previously worked as a sandwich maker, a security guard, a valet, a taxi driver, a van driver, a sales clerk, a bank teller, and a counter clerk.  R. 36-43.  Abubakar filed his application for SSDI and SSI benefits on November 4, 2008.  R. 82.  He alleged disability due to depression, anxiety, mental disorder, memory problems, diabetes, and HIV.  R. 91.

## III.     Procedural History

After initial review of Abubakar's claim, the SSA denied his claim on January 12, 2009.  R. 86.  The SSA then denied his claim upon reconsideration on July 15, 2009.  R. 84-85.  On August 21, 2009, Abubakar filed a timely request for a hearing before an ALJ.  R. 97.  A hearing was held before an ALJ on September 21, 2010.  R. 20.  In a written decision dated November 24, 2010, the ALJ determined that Abubakar did not have a disability within the definition of the Social Security Act and denied Abubakar's claim.  R. 19.  The Decision Review Board selected the claim for additional review, but did not conduct its review within the requisite time period, rendering the ALJ decision final on March 10, 2011.  R. 1.  This appeal for judicial review followed.

## IV.     Discussion

### A.      Legal Standards

#### 1.      Entitlement to Disability Benefits and Supplemental Security Income

In order to receive SSDI and SSI benefits, claimants must demonstrate that they are disabled,

---

[1]Citations to the administrative record in this case, Docket No. 9, shall be to "R. __."

as defined by the Social Security Act ("Act") and corresponding regulations.  42 U.S.C. § 423(a).

The Act and regulations define disability as an "inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be expected to

result in death or has lasted or can be expected to last for a continuous period of not less than

[twelve] months."  42 U.S.C. § 416(i); 20 C.F.R. § 404.1505(a).  Further, the impact of the disability

or disabilities must be so severe as to prevent a claimant from not only maintaining employment

similar to previous work, but also, from doing any substantial gainful activity that exists in the

national economy.  42 U.S.C. § 423(a)(2)(A)-(2)(B); 20 C.F.R. §§ 404.1505-404.1511.

The Commissioner must follow a five-step process to determine whether a claimant has a

disability for Social Security purposes and, thus, whether to approve the claimant's application for

benefits.  Id. § 416.920(a).  If at any step in the process the Commissioner conclusively finds the

claimant to be disabled or not disabled, then the inquiry ends.  Id. § 416.920(a)(4).  First, if the

claimant is doing any substantial gainful activity, then the claimant is not disabled.  Id. §

416.920(a)(4)(i).  Second, if the claimant does not have, or has not had during the relevant time

period, a severe, medically determinable physical or mental impairment or combination of

impairments, then the claimant is not disabled.  Id. § 416.920(a)(4)(ii).  Third, if the claimant's

impairment(s) meets the conditions for one of the "listed" impairments in the Social Security

regulations, then the claimant is disabled.  Id. § 416.920(a)(4)(iii).  Fourth, if the claimant's

"residual functional capacity" ("RFC") shows that the claimant can still perform past relevant work,

then the claimant is not disabled.  Id. § 416.920(a)(4)(iv).  Last, if the claimant's RFC, education,

work experience, and age show that the claimant is capable of any other work in the national

economy, then the claimant is not disabled.  Id. § 416.920(a)(4)(v); see also id. § 416.960(c).

### 2.      Standard of Review

This Court has the power to affirm, modify, or reverse the decision of the Commissioner upon review of the pleadings and record.  42 U.S.C. § 405(g).  Such review is "limited to determining whether the ALJ deployed the proper legal standards and found facts upon the proper quantum of evidence."  Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999).  The ALJ's findings of fact are conclusive if supported by substantial evidence.  42 U.S.C. § 405(g); see also Manzo-Pizzaro v. Sec'y of Health and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996) (citing 42 U.S.C. § 405(g)).  However, the findings of fact are not conclusive when reached through "ignoring evidence, misapplying the law, or judging matters entrusted to experts."  Nguyen, 172 F.3d at 35.  Substantial evidence exists only "if a reasonable mind, reviewing the evidence in the record as a whole, could accept it as adequate to support [the Commissioner's] conclusion."  Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

### B.      Evidence before the ALJ

### 1.      Medical History

There was considerable evidence before the ALJ about Abubakar's medical history, including diagnoses and treatment, particularly in regard to the conditions upon which Abubakar relied in claiming a disability in his application for benefits.  Abubakar cited depression, anxiety, mental disorder, memory problems, diabetes, and HIV as his disabling ailments.  R. 91.  The ALJ defined Abubakar's ailments as "schizoaffective disorder, depression, polysubstance abuse, diabetes mellitus, and human immunodeficiency virus (HIV)."  R. 10.

### a.        Mental Health Issues:  Schizoaffective Disorder and Depression

The record indicates that Abubakar began seeing Dr. Michelle Demjen for evaluation of his mental health and treatment on February 12, 2007.  R. 304.  After their first session, Dr. Demjen indicated in her report that Abubakar was likely suffering from a mood disorder and post-traumatic stress disorder.  R. 305.   In her treatment reports, she noted that at times Abubakar could be "distracted and tangential," "difficult to follow/redirect," depressed, and could display psychotic symptoms.  R. 300, 305.  It appears from the record that Abubakar stopped seeing Dr. Demjen after June 11, 2007.  R. 298.

Abubakar next saw Mr. Ozzie Dias, a social worker at the South Middlesex Opportunity Council, from November 17, 2008 to March 4, 2009.  R. 369.  Mr. Dias noted in his evaluation that Abubakar appeared to suffer from some symptoms of depression, such as lack of energy and motivation, but could interact with others and handle some work-related tasks.  R. 369.

On January 5, 2009, Dr. Richard Stellar, Ed.D, a psychologist, evaluated Abubakar.  R. 330. In his evaluation, Dr. Stellar noted that Abubakar left his last job due to his hours being cut, took care of his daily responsibilities and socialized some with his roommates.  R. 331.  Dr. Stellar further wrote that Abubakar's "mood is generally quite good.  He denies  depression . . . anxiety or nervousness.  He denies any problems with hallucinations or delusions." R. 332.  In his evaluation, Dr. Stellar wrote that Abubakar denied any issues with bipolar disorder, depression, or anxiety.  R. 332.  Dr. Stellar found that Abubakar presented very normally and stated that he was able to and wants to work.  R. 333-34.  In his report, Dr. Stellar concluded that future examiners will need to rule out psychosis, mood disorder, and post-traumatic stress disorder from the list of potential

conditions affecting Abubakar. R. 335.

On January 9, 2009, Dr. Fischer conducted  Psychiatric Review Technique ("PRT") and RFC assessments after reviewing Abubakar's medical records,  including the evaluation conducted by Dr. Stellar.  R. 336, 349.  In the PRT assessment, Dr. Fischer indicated that Abubakar may be affected by schizophrenic or other psychotic disorders, affective disorders, and anxiety-related disorders.  R. 336.  Dr. Fischer's  PRT assessment concluded that Abubakar's conditions mildly limit his ability to perform daily activities and moderately limit his ability to maintain social functioning and to maintain concentration, persistence, or pace.  R. 346.  In the RFC assessment, Dr. Fischer concluded that Abubakar's conditions do not place any marked limitations on his functioning and place moderate limitations on his functioning in seven out of twenty areas.[2]  R. 349-50. Dr. Fischer ultimately concluded that Abubakar can understand, remember, and carry out simple instructions, interact around work-related issues, and adapt to routine stressors.  R. 351.

Dr. Kathryn Collins-Wooley conducted her own PRT and RFC assessments upon review of the updated medical record on July 10, 2009.[3]  R. 401.  In her PRT assessment, Dr. Collins-Wooley

_____

[2]The seven areas were: 1) ability to understand and remember detailed instructions; 2) ability to carry out detailed instructions; 3) ability to maintain attention and concentration for extended periods; 4) ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 5) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; 6) ability to interact appropriately with the general public; and 7) ability to respond appropriately to changes in the work setting.

[3]The ALJ erroneously noted that this RFC assessment took place in July 2010.  R. 16. This error does not impact the conclusion that the ALJ's decision was supported by substantial evidence.

indicated that Abubakar may be affected by affective disorders, anxiety-related disorders and substance addiction disorders.  R. 401.  Dr. Collins-Wooley concluded in her assessment that Abubakar's conditions only mildly limit his ability to perform activities of daily living and maintain social functioning and moderately limit his concentration, persistence, or pace.  R. 411.  In her RFC assessment, Dr. Collins-Wooley concluded that Abubakar's conditions imposed marked limitation in one of the twenty areas and moderate limitation in five of the twenty.[4]  R. 414-15.  Dr. Collins-Wooley ultimately concluded in her RFC assessment that Abubakar was generally not limited and where limitations were present she concluded that he was able to "focus sufficiently for simple tasks at a reasonable pace" and can "remain appropriate for simple social demands."  R. 416.

Starting on July 14, 2009, Abubakar began to attend biweekly therapy sessions with Dr. Ross Kleiman, Ph.D, a psychologist at the Cambridge Health Alliance.  R. 478.  In his reports, Dr. Kleiman indicated that Abubakar was likely affected by schizoaffective disorder.  R. 480.  Dr. Kleiman further noted Abubakar could be "[g]uarded and anxious presentation, with loose association at times . . . [but was] [a]ble to be re-directed."  R. 479-80.  Over the next several months, Dr. Kleiman noted in his reports that Abubakar had improved in this area, particularly after

---

[4]The area of marked limitation was the ability to interact appropriate with the general public.  The five areas of moderate limitation were: 1) the ability to maintain attention and concentration for extended periods; 2) the ability to perform regular activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 3) the ability to sustain an ordinary routine without special supervision; 4) the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; and 5) the ability to accept instructions and respond appropriately to criticism from supervisors.

he began pharmacological therapy.  R. 464-66.

On July 28, 2009, Dr. Debra Rosenblum evaluated Abubakar.  R. 460.  In her evaluation, Dr. Rosenblum noted that Abubakar was able to care for many of his basic needs, such as purchasing and cooking his own food and cleaning his apartment, while he worked part time to supplement his limited income.  R. 461.  Dr. Rosenblum further noted that while Abubakar presented in a normal manner he did describe himself as "very depressed" and his mood was anxious, but he spoke "without any looseness of association, flight of ideas, or tangentiality."  R. 460-61.  Dr. Rosenblum noted in her evaluation that Abubakar recognized past psychological difficulties, such as hallucinations and paranoid ideation, but denied that those difficulties currently affected him.  R. 461.  In her evaluation, Dr. Rosenblum ultimately concluded that while Abubakar had a history of psychological issues, his symptoms were "ameliorated somewhat as a result of current outpatient therapy . . . his prognosis is somewhat good at this time."  R. 462.

On December 10, 2009, Abubakar began to undergo psychopharmacological treatment with Dr. Catherine Fullerton, a psychiatrist at Cambridge Health Alliance.  R. 476.  In their initial meeting, Dr. Fullerton noted in her report that Abubakar "has some psychotic process occurring." R. 477.  Dr. Fullerton started Abubakar on medication to help control his symptoms and help him sleep.  R. 477.  After their next session on December 24, 2009, Dr. Fullerton noted in her report that Abubakar had stated that the medication "calmed him" but he still had exhibited paranoid and anxious behavior.  R. 473.  On January 5, 2010, Dr. Fullerton noted in her report that during their session Abubakar "at times appeared frustrated" and that his speech had been at a "mildly increased

rate," but that he had been easier to interrupt, his mood had been good, his thought process had improved, and that he had appeared "mildly more organized." R. 470-71. On February 23, 2010, Dr. Fullerton conducted an RFC assessment for Abubakar. R. 558. Her analysis found Abubakar to be moderately limited in fifteen of the twenty areas and markedly limited in four of the twenty areas.[5] R. 558-59. Dr. Fullerton noted, in the assessment, that Abubakar had difficulty adapting to changes in his daily routine and could behave inappropriately at times, which would make it difficult for him to work. R. 560. In her March 25, 2010 report, Dr. Fullerton noted that Abubakar's mood and thought process would likely improve with consistent medication. R. 590. On August 3, 2010, Dr. Fullerton met with Abubakar and noted in her report that he reported that the medications helped him think clearly and feel "in touch with reality." R. 580. On September 16, 2010, Dr. Fullerton

---

[5]The fifteen areas of moderate limitation were: 1) ability to remember locations and work-like procedures; 2) ability to understand and remember very short and simple instructions; 3) ability to carry out very short and simple instructions; 4) ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 5) ability to sustain an ordinary routine without special supervision; 6) ability to work in coordination with or proximity to others without being distracted by them; 7) ability to make simple work-related decisions; 8) ability to interact appropriately with the general public; 9) ability to accept instructions and respond appropriately to criticism from supervisors; 10) ability to get along well with coworkers or peers without distracting them or exhibiting behavioral extremes; 11) ability to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; 12) ability to respond appropriately to changes in the work setting; 13) ability to be aware of normal hazards and take appropriate precautions; 14) ability to travel in unfamiliar places or use public transportation; and 15) to set realistic goals or make plans independently of others. The four areas of marked limitation were: 1) ability to understand and remember detailed instructions; 2) ability to carry out detailed instructions; 3) ability to maintain attention and concentration for extended periods; and 4) ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.

provided a letter in support of Abubakar's appeal for SSI and SSDI benefits asserting that his mental condition made it impossible for him to work and was part of why he has had so much difficulty in maintaining employment.  R. 696-97.

### b.    Polysubstance Abuse

The record indicates that Abubakar had a history of substance abuse pre-dating his onset date.  Dr. Demjen detailed the abuse in her treatment reports from 2007.  R. 304-05.  In those reports, Dr. Demjen noted that Abubakar regularly used cocaine, marijuana, and alcohol, and in the past, he had used ecstasy and crystal meth as well.  R. 304-05.  Her reports indicate that the abuse continued throughout the time period during which Abubakar met with her.  R. 300.  Mr. Diaz, M.S.W., noted in a May 26, 2009 letter that Abubakar, with whom he had worked between November 17, 2008 and March 4, 2009, had a history of substance abuse and that he had been diagnosed with cocaine dependence and nicotine dependence.   R. 369.

Dr. Stellar noted in his January 5, 2009 evaluation that Abubakar denied any current or prior substance abuse.  R. 331-32.  Dr. Rosenblum reported in her July 29, 2009 evaluation that Abubakar continued to deny any current or prior substance abuse during her evaluation.  R. 460.

On July 14, 2009, Dr. Kleiman noted in his report that Abubakar had stated that he still used alcohol but had resisted using other drugs.  R. 479.  Dr. Kleiman further reported that the polysubstance abuse was in early remission.  R. 480.  Dr. Kleiman noted in his treatment reports that he worked regularly with Abubakar to help him maintain his sobriety.  R. 464-68.  Dr. Fullerton noted in her reports that she also encouraged and worked with Abubakar to maintain his sobriety.

R. 476.  Her reports indicated that Abubakar had been successful in maintaining his sobriety with a few brief relapses.  R. 470, 590, 696.

### c.  HIV Infection

The records from Abubakar's treatment at the Cambridge Health Alliance indicate that he had been diagnosed with HIV in 2005.  R. 308.  Several medical sources noted in their reports and in lab results that since the onset of Abubakar's disability his HIV infection has remained stable and has not required any significant treatment, such as anti-retroviral therapy.  R. 309, 457, 610.  In addition to a low viral count, Abubakar's physicians have noted in their reports that he has shown no symptoms of HIV infection.  R. 309, 457.  Abubakar had undergone two physical RFC assessments in an effort to determine whether there are any physical limitations imposed by his HIV infection, on December 10, 2008 and April 21, 2009, both of which indicated that he had no physical limitations and was capable of light work.  R. 357-64, 417-24.

### d.  Diabetes

The record indicates that Abubakar was diagnosed with diabetes mellitus type II on June 8, 2009. R. 381.  He was prescribed medication and was given instructions regarding diet and exercise in light of the diagnosis of diabetes.  R. 381.  Additionally, Dr. Fullerton has noted in her reports that he has had difficulty following his treatment plan and his medical record indicates that on occasion he has ended up in the hospital due to complications arising from his diabetes.  R. 580, 592, 610, 613.

### 2.  ALJ Hearing

At the September 21, 2010 administrative hearing, the ALJ heard testimony from Abubakar and vocational expert ("VE") James Scorzelli.  R. 26.

### a.    Abubakar's Testimony

Abubakar testified that he had last worked, on a part-time basis, for several months as a parking lot attendant in Cambridge, but was fired from that position in March 2010.  R. 32-33.  He testified that prior to that he had worked as a line cook making sandwiches, as a security guard, as a valet, as a taxi driver, as a van driver, as a retail clerk, as a counter clerk, and as a bank teller.  R. 36-43.  He testified that his employment history, with periods of unemployment between positions, extended from March 2010 back to 1995.  R. 36-43.

Abubakar repeatedly testified that his depression places limits on his ability to work.  R. 31, 34.  He stated that the depression can be so bad at times that it is "hard to even get out of bed sometimes . . . [to] [l]eave the house sometimes."  R. 34.   He testified that he is too depressed at times to leave his house at all, whether to go to work or to class.  R. 34.  In addition to depression, Abubakar testified that his anxiety problems also make it so he is unable to work.  R. 44.  He testified that "I feel like people are judging me and looking at me . . . .  And I feel like I kind of have to stand on the side . . . 'till I can get a space to myself where I can – to breathe."  R. 44.  He further testified that in classes he sits in the back, away from the rest of the students, to give himself the space he needs to breathe and not feel claustrophobic.  R. 55.  With respect to substance abuse, Abubakar testified that he had not used cocaine or other hard drugs since his relapse in January 2010 and that he has abstained from drinking alcohol for at least three months.  R. 44.

12

Abubakar testified that despite his depression, he is able to push himself to get up and attend class or meet his other obligations.  R. 54.  He testified that his class attendance is pretty good and that he only misses class about once per month.  R. 53.  He further testified that he passes his classes getting grades in the B and C range.  R. 30-31.  He testified that his one "incomplete" for a class stems from a period where he was in and out of the hospital due to complications from diabetes.  R. 30.  When asked about why he left or was fired from different positions in his employment history, Abubakar never testified that he was fired for failure to attend work or for too many absences.  R. 36-43.  Abubakar also testified that he is capable of going out and taking care of his personal needs without assistance.  R. 46-47.  Abubakar testified that despite his anxiety, he can take public transit to get around the city, he is able to maintain relationships with and relate to his roommates and family members, he can collaborate with fellow students when necessary, and that he gets along well with the people he worked with in the past.  R. 45, 49, 56-57.

**b.     VE's Testimony**

The VE, James Scorzelli, testified that he was present during Abubakar's testimony and had an opportunity to review the documents included as exhibits.  R. 68.  He testified that Abubakar's prior work as a parking lot attendant and counter clerk qualify as light unskilled work.  R. 69-70.  He testified that Abubakar's prior work as a sandwich maker qualifies as medium unskilled work.  R. 69.  He testified that Abubakar's prior work as a security guard and salesclerk both qualify as light semi-skilled work.  R. 69.  He also testified that Abubakar's prior work as a van driver qualifies as medium semi-skilled work.  R. 69.

13

The ALJ posed the following hypothetical to the VE:

> Now assume if you will that a hypothetical person is of the same age, education, language, work experience as the claimant. Further assume that the work this particular person could perform would be subject to the following limitations. This person would be able to understand and carry out simple instructions; [could carry out] three to four step tasks; would be able to maintain concentration, consistence in pace over two-hour increments over an eight-hour workday for forty hours in a work week; and the performance of these simple group tasks. This person would be able to relate to coworkers, supervisors, and the public on a superficial interactional basis. Would such a person be able to perform any of the past work of the claimant?

R. 70-71. The VE responded that these limitations would permit the hypothetical person to do his past unskilled jobs as a parking lot attendant, counter clerk, and sandwich maker. R. 71. Additionally, the VE testified that the hypothetical person could do other simple unskilled jobs, such as serve as a mail clerk, an electronic assembler, or a gluer. R. 71.

The ALJ posed a second hypothetical to the VE:

> Now, assume if you will that a hypothetical person had the following limitations. This person would have marked limitation in the ability to understand and remember detailed instructions; the inability to carry out detailed instructions, and the ability to maintain concentration and attention for extended periods of time; the ability to complete a normal workday or work week without interruptions from psychologically-based symptoms; and to perform [at] any consistent pace without [an] unreasonable number of . . . rest periods. Those would be the limitations. Would such a person be able to perform any work in the regional or national economy?

R. 72. The VE responded that there would be no work this hypothetical person could perform due to the need for unscheduled breaks and inability to concentrate. R. 72.

14

3. **Findings of the ALJ**

Following the five-step process proscribed by 20 C.F.R. § 416.920, at step one, the ALJ found that Abubakar had not engaged in substantial gainful activity since July 2, 2008, the onset date.  R. 9.  Abubakar does not dispute the ALJ's findings at step one.

At step two, the ALJ found that Abubakar had the following severe impairments: schizoaffective disorder, depression, polysubstance abuse, diabetes mellitus, and HIV.  R. 10. Abubakar does not dispute the ALJ's findings at step two.

At step three, the ALJ found that Abubakar did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  R. 10.  Abubakar does not dispute the ALJ's findings at step three.

Before reaching step four, the ALJ determined Abubakar's RFC, finding that Abubakar "has the [RFC] to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b) with the following limitations:  he can understand and carry out simple instructions defined as [three] to [four] step tasks; he is able to maintain concentration, persistence and pace for two-hour periods over an [eight]-hour workday and [forty]-hour workweek in the performance of simple repetitive tasks; and he can relate to co-workers, supervisors and the general public on a superficial interactional basis."  R. 11.  Consequently, at step four the ALJ found that Abubakar is capable of performing past relevant work as a valet parker, sandwich maker, and counter clerk because the work does not require the performance of work-related activities precluded by the claimant's RFC. R. 17.  Abubakar disputes the ALJ's RFC assessment and his finding that Abubakar can perform

past relevant work claiming that the ALJ's assessment was not supported by substantial evidence. Pl. Br. 10.

The ALJ went on to step five finding that because of Abubakar's age, education, work experience, and RFC, there are other jobs that exist in significant numbers in the national economy that Abubakar can also perform.  R. 18.  Abubakar also disputes this finding claiming that it was not supported by substantial evidence.  Pl. Br. 10.

### C.      Abubakar's Challenges to the ALJ's Findings

Abubakar contends that the ALJ erred by (1) failing to give controlling or substantial weight to the opinion of Abubakar's treating physician, Dr. Fullerton, and by failing to contact her to clarify any issues in her opinion rather than reaching a conclusion without any clarification; and (2) by giving substantial weight to non-treating physicians' opinions despite the fact that they had not reviewed the entirety of the record.[6]  For the reasons discussed below, Abubakar's claims fail.

### 1.      Weighing Dr. Fullerton's Opinion

Abubakar argues that the ALJ erred by failing to give controlling weight to the medical opinions of Abubakar's treating physician, Dr. Fullerton.  He argues further that the opinion of Dr. Fullerton, even if not granted controlling weight, should have at least been granted substantial weight and that the ALJ erred by failing to properly explain his reasons for granting little weight to the opinion of Dr. Fullerton.  Lastly, he contends that the ALJ had an obligation to recontact Dr.

---

[6]Abubakar does not challenge the findings of the ALJ concerning his physical condition. Instead, he focuses his challenges on the findings of the ALJ with respect to his mental conditions.  See Pl. Br. 4-5, 14; Def. Br. 4 n. 2.

Fullerton to clarify her opinion.

### a.   Controlling Weight for Treating Physician's Opinion

The opinion testimony of the treating physician must be given controlling weight if it is well-supported and not inconsistent with the other substantial evidence on the record.  20 C.F.R. § 404.1527(d)(2); see also Clayton v. Astrue, No. 09-10261-DPW, 2010 WL 723780, at *6 (D. Mass. Feb. 16, 2010) (applying the consistency standards of 20 C.F.R. § 404.1527(d)(2)).  This means that while there is a general presumption of deference to the treating physician's opinion, the ALJ can choose not to grant the opinion controlling weight if that opinion is inconsistent with other substantial evidence in the record.  Green v. Astrue, 588 F. Supp. 2d 147, 154 (D. Mass. 2008).  Decisions regarding inconsistencies between a treating physician's opinion and other evidence in the record are for the ALJ, and not the Court, to resolve.  Costa v. Astrue, 565 F. Supp. 2d 265, 271 (D. Mass. 2008) (citing Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981)).

Here, the ALJ found Dr. Fullerton's opinion to be inconsistent with the other substantial evidence in the record.  R. 16.  The ALJ based this finding on the fact that the medical record as a whole, as well as Abubakar's testimony, contradicted Dr. Fullerton's opinion.  R. 16.  The ALJ found that while Dr. Fullerton had indicated that Abubakar had "marked limitations with respect to his ability to perform activities of daily living, in social functioning, and in maintaining concentration, persistence and pace" and that his illnesses impacted his ability to attend school, complete work, and pass his classes, Abubakar himself testified that he had been successful in

attending and passing classes, working a part-time job while doing so, performing his daily activities, and getting along well with co-workers, roommates, and family members. R. 16. The ALJ cited this contradiction in deciding not to give Dr. Fullerton's opinion controlling weight. R. 16. In reaching this conclusion, the ALJ properly relied on testimony from Abubakar about his symptoms and activities as well as support for the ALJ's conclusion elsewhere in the medical record. See Frustaglia v. Sec'y of Health and Human Servs., 829 F.2d 192, 195 (1st Cir. 1987) (citing DaRosa v. Sec'y of Health and Human Servs., 803 F.2d 24, 26 (1st Cir. 1986)) (finding that it is for the ALJ to determine how testimony fits in with the rest of the evidence and deference must be given to those considerations). Further, the ALJ found that in addition to Abubakar's testimony the opinion evidence offered by Dr. Fullerton was inconsistent with the evidence provided by the other medical experts, which he found were more consistent with each other and the information provided in Abubakar's testimony. R. 16; compare R. 558-559 (Dr. Fullerton's RFC assessment finding Abubakar to be limited in his ability to work), and R. 696-97 (supporting letter detailing Dr. Fullerton's conclusions that Abubakar's mental condition completely disables him), with R. 348-51 (Dr. Fischer's RFC assessment detailing that Abubakar has a few moderate limitations but is otherwise fully capable of work related tasks), R. 414-16 (Dr. Rosenblum's RFC assessment detailing the same), and R. 30-31, 36-43, 45-47, 49, 53-54 (Abubakar's testimony detailing how he is capable of attending and passing his classes, taking care of his daily needs, socializing with others, and that he has never been fired from a job due to his disability). Accordingly, due to the inconsistency between Dr. Fullerton's opinion and the record as whole, it was within the ALJ's

power not to grant controlling weight to the opinion of Dr. Fullerton, Abubakar's treating physician. Green, 588 F. Supp. 2d at 154.

### b.      Substantial Weight for Treating Physician's Opinion

If the opinion of a treating physician is not given controlling weight, it is within the ALJ's discretion to decide how much deference to give the treating physician's opinion.  20 C.F.R. § 404.1527(d)(2).  The opinion will be evaluated based on the following factors:  1) length of treatment relationship and frequency of examination; 2) nature and extent of the treatment relationship; 3) how well supported the conclusion is by relevant evidence; 4) how consistent the opinion is with the record as a whole; 5) how specialized the knowledge is of the treating physician; and 6) other factors that may be relevant.  Id. §§ 404.1527(d)(2)-(d)(6).  The ALJ abuses his discretion when he "ignore(s) medical evidence or substitute(s) his own views for uncontroverted medical opinion."  Nguyen, 172 F.3d at 35 (1st Cir. 1999).

Here, the ALJ found the treatment relationship between Dr. Fullerton and Abubakar had been long, approximately nine months, they met frequently, and Dr. Fullerton has specialized knowledge of Abubakar's conditions.  R. 13.  However, as discussed above, Dr. Fullerton's opinion was inconsistent with nearly all other evidence in the record, including the testimony of Abubakar, the claimant himself.  R. 16.  Again, the ALJ found that while Dr. Fullerton had declared Abubakar to be markedly limited in numerous areas, Abubakar's own testimony indicated that he did not face as severe a set of limitations as indicated by Dr. Fullerton.  R. 16  The ALJ found that Abubakar's testimony was also more consistent with the assessments provided by Drs. Rosenblum and Fischer

and the record as a whole.  R. 16  These factors together led the ALJ to hold that Dr. Fullerton's

opinion was "unsubstantiated by the record as a whole and . . . accorded little weight."  R. 16.

Upon review of the record, this court finds that the opinion evidence offered by Dr. Fullerton

is inconsistent with the majority of the remaining medical evidence.  Compare R. 558-559, and R.

696-97, with R. 348-51, R. 414-16, and R. 30-31, 36-43, 45-47, 49, 53-54.   Accordingly, it was

within the discretion of the ALJ to weigh the various factors, and it was proper for him to grant little

weight to evidence provided by the treating physician that was inconsistent with the remainder of

the record.  See Arruda v. Barnhart, 314 F. Supp. 2d 52, 72 (D. Mass. 2004) (finding the ALJ can

"downplay the weight afforded a treating physician's assessment . . . where . . . it is . . . inconsistent

with other evidence in the record").  Therefore, the ALJ did not err in granting little weight to the

opinion evidence of Dr. Fullerton.

### c.      Providing Sufficient Explanation for Weight Given

Regulations require that the ALJ "give good reasons in [the] notice of determination or

decision for the weight [the ALJ] gives [claimant's] treating source's opinion."  20 C.F.R. §

404.1527(d)(2).   The SSA has elaborated on this requirement stating that "the notice of

determination . . . must be sufficiently specific to make clear to any subsequent reviewers the weight

the adjudicator gave to the treating source's medical opinion and the reasons for that weight."

Giving Controlling Weight to Treating Source Medical Opinions, SSR 96-2p, 1996 WL 374188, at

*5 (S.S.A. July 2, 1996).

Here, while the ALJ did not go to great lengths to explain the weight granted in relation to

20

the factors listed in 20 C.F.R. § 404.1527(d), he did make it clear why he opted to grant little weight to the opinion of the treating physician by noting in detail the inconsistencies between the treating physician's opinion and the remainder of the record.   R. 16.   Additionally, the ALJ provided a detailed overview of the numerous examinations of Abubakar by different doctors and the conclusions of those doctors.   R. 11-17.   This led the ALJ to conclude that Dr. Fullerton's opinion was inconsistent with the remainder of the medical record and was contradicted by the testimony of Abubakar during the hearing.   R. 16.   The ALJ's analysis makes clear the evidence he relied on in reaching his decision, which satisfies the requirements of 20 C.F.R. § 404.1527(d).   See Green, 588 F. Supp. 2d at 155 (finding that the ALJ's failure to go through each individual factor highlighted in the statute does not require remand so long as the ALJ's decision and reasoning are "sufficiently clear").   Therefore, the ALJ did not err by not systematically evaluating the opinion with respect to each individual factor listed in 20 C.F.R. § 404.1527(d).

### d.      Contacting Treating Physician to Clarify Opinion

The ALJ must "seek additional evidence or clarification from [a claimant's] medical source when the report from [that] medical source contains a conflict or ambiguity that must be resolved." 20 C.F.R. § 404.1512(e)(1).   The SSA has explained that this regulation requires that an ALJ recontact the treating physician only when the ALJ cannot determine the basis of a treating physician's opinion from the record.   See Medical Source Opinions on Issues Reserved to the Commissioner, SSR 96-5p, 1996 WL 374183, at *6 (S.S.A. July 2, 1996) (stating that an ALJ needs to recontact the physician only "if the evidence does not support a treating source's opinion on any

issue reserved to the Commissioner and the adjudicator cannot ascertain the basis of the opinion from the case record").  Accordingly, an ALJ must contact the medical source only when there is ambiguity in the opinion of the treating physician, not when evaluations are inconsistent with other information in the record or when the ALJ finds the treating physician's opinion unpersuasive. Green, 588 F. Supp. 2d at 155 (concluding that if there is adequate information for the ALJ to make a finding regarding disability, the ALJ need not recontact a medical source for clarification about his/her opinion).

Here, the ALJ found that while Dr. Fullerton's opinion may be inconsistent with other evidence in the medical record, there was "adequate and sufficient evidence to reach a conclusion regarding disability on the existing record."  R. 16.  Under these circumstances, it was unnecessary for him to recontact Dr. Fullerton for further clarification.  See Hutchins v. Astrue, No. 09cv10900-NG, 2010 WL 3895183, at *5 (D. Mass. Sept. 30, 2010) (finding that the ALJ is not required to recontact the treating physician simply because he finds the opinion evidence offered conflicted with other opinion evidence in the record).  Therefore, the ALJ did not err by refusing to recontact Dr. Fullerton.

For all these reasons, the ALJ did not err when assigning little weight to the opinion of Dr. Fullerton, explaining his decision to assign little weight to her opinion, and declining to recontact her before doing so.

### 2.    The ALJ's Grant of Substantial Weight to the Non-Treating Physicians' Opinions

Abubakar next argues that the ALJ erred in granting substantial weight to the opinions of

non-treating and non-examining physicians.  Additionally, he argues that the ALJ erred in relying on the non-treating opinions because those opinions only reflected part of the record rather than the entire record.

### a.      Properly Weighing Opinions

In weighing the opinions of non-treating physicians, the factors an ALJ weighs are:  1) how well supported the conclusion is by relevant evidence; 2) how consistent the opinion is with the record as a whole; 3) how specialized the knowledge is of the physician; and 4) other factors that may be relevant.  See id. §§ 404.1527(d)(3)-(d)(6).  See Berrios-Lopez v. Sec'y of Health and Human Servs., 951 F.2d 427, 431 (1st Cir. 1991) (finding it is appropriate for ALJs to rely on reports from non-treating physicians when they are more consistent with the record than reports provided by treating physicians).

Here, the ALJ found that the medical data and assessments provided by the non-treating physicians were consistent with each other and were corroborated by the testimony of Abubakar. R. 15-16.  These physicians repeatedly indicated that Abubakar only faced mild or moderate limitations from his mental condition and would still be able to perform light unskilled work, which was corroborated by Abubakar's testimony that he was able to attend and pass his classes, socialize with roommates, co-workers, and family, take care of his daily living needs, and at times maintain part time employment to supplement his income.  R. 16.  For these reasons, the ALJ granted these opinions substantial weight and relied on them to render his ruling.  R. 16.

Upon review, the opinion evidence offered by the non-treating physicians was consistent

with the majority of medical evidence in the record and with the testimony of Abubakar himself. See e.g., R. 348-51 (Dr. Fischer's RFC assessment detailing that Abubakar has a few moderate limitations but is otherwise fully capable of work related tasks); R. 414-16 (Dr. Rosenblum's RFC assessment detailing the same); R. 30-31, 36-43, 45-47, 49, 53-54 (Abubakar's testimony detailing how he is capable of attending and passing his classes, taking care of his daily needs, socializing with others, and that he has never been fired from a job due to his disability).  Accordingly, where, as here, there was substantial evidence supporting the ALJ's decision, the ALJ did not err in relying on the opinions of the reviewing doctors, not the treating doctor.   See Cooper v. Astrue, No. 10-10782-RGS, 2011 WL 1163127, at *6 (D. Mass. Mar. 29, 2011) (finding that if "the choice is supported by substantial evidence, the ALJ may prefer the opinion of a reviewing physician to that of a claimant's treating physician"); see also Lopes v. Barnhart, 372 F. Supp. 2d 185, 194 (D. Mass. 2005) (finding that where a treating physician's opinion was not consistent with the record as whole the opinions of non-treating physicians can be given greater weight); Arruda, 314 F. Supp. 2d at 74 (finding that evidence from non-treating physicians can serve as substantial evidence when supported by other evidence in the record).

### b.      Reliance on Older Medical Opinions

Abubakar argues that the ALJ cannot rely on the opinion provided by non-treating physicians because those physicians did not have the opportunity to review any medical files since his treatment by Drs. Kleiman and Fullerton had begun, an opportunity that Dr. Fullerton had.  Pl. Br. 16.  While recognizing that it is the duty of the ALJ to determine if the claimant is disabled, the

First Circuit has held that medical evidence too far removed from the relevant time period may not be utilized to serve as substantial evidence if there is an indication in the more recent records that there has been a significant change in the claimant's condition.  Soto-Cedeño v. Astrue, 380 Fed. Appx. 1, 2 (1st Cir. 2010).  On the other hand, the ALJ may rely on older evidence when the information in that evidence remains accurate.  See Ferland v. Astrue, No. 11-cv-123-SM, 2011 WL 5199989, at *4 (D.N.H. Oct. 31, 2011) (finding that "an ALJ may rely on such an opinion where the evidence postdating the reviewer's assessment does not establish any greater limitations . . . or where the medical reports of claimant's treating providers are arguably consistent with . . . the reviewer's assessment")

Here, there is no indication in the record that Dr. Fullerton noted a marked change in the condition of Abubakar until she issued her RFC and letter of support, which portrayed Abubakar as completely disabled.  In fact, the ALJ noted that Dr. Fullerton's records indicated that with proper pharmacological treatment Abubakar's conditions had improved slightly.  R. 14, 470, 580. Additionally, the testimony of Abubakar was corroborated by the evidence and evaluations in the record prior to his treatment by Dr. Fullerton.  R. 16.  Therefore, the ALJ did not err in relying on the older opinions given the fact that the testimony of Abubakar was consistent with that evidence and not with the opinion supplied by Dr. Fullerton.  MacDougall v. Astrue, No. 2:10-cv-400-GZS, 2011 WL 4566268, at *5 n.7 (D. Me. Sept. 29, 2011) (distinguishing Soto-Cedeño by noting that where an older medical opinion was consistent with and supported by current statements of the claimant, an ALJ can properly rely on it instead of the treating doctor's RFC which was inconsistent

with the claimant's current statements).

For all these reasons, the ALJ did not err when assigning substantial weight to the opinions of the non-treating physicians.

**V.     Conclusion**

Based on the foregoing, the Commissioner's motion to affirm is GRANTED, Abubakar's motion to reverse or remand is DENIED, and the Commissioner's decision is AFFIRMED.

**So ordered.**

/s/ Denise J. Casper
United States District Judge